**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
ELENA KRAEMER,

              Plaintiff,                              **COMPLAINT**

vs.

DOUGLAS SCHROEDER, JIAN WANG,
GARY MARTENS & ANAMARIA BONILLA,

              Defendants.
-----------------------------------------------------------x

### PARTIES

1.    Plaintiff Elena Kraemer is a female who resides in the State of New Jersey. At all relevant times, she worked for Metro North Railroad [MNR].

2.    At all relevant times, defendants Douglas Schroeder worked as Deputy Director of Technical Services, Jian Wang, was plaintiff's manager, Gary Martens was an HR Partner and Anamaria Bonilla was Deputy Chief Engineer for MNR.  Together, defendants made the decisions referenced herein, including that to terminate plaintiff's employment announced on June 8, 2023.

### JURISDICTION

3.    As defendants each under color or state law and each acted intentionally to discriminate against plaintiff in part because of her gender, this honorable court has jurisdiction pursuant to 28 U.S.C. secs. 1331, 1343 (3) & (4) and 42 U.S.C. sections 1983 and 1988. The Honorable Court has ancillary jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. section 1367 as these arise from the same nucleus of operative facts as her federal causes of action.

### STATEMENT OF FACTS

4.    Plaintiff worked as a senior structural engineer of the Grand Central Terminal Inspection Group for MNR within a unit charged with overseeing consultants, inspecting and ensuring the safety of track conditions and infrastructure in and around Grand Central Station.

5.      Among those plaintiff supervised  starting in December 2018 was Miyer Inoyatov [hereinafter "Miyer"], a male, who, like her, was from the Soviet Union, and Shevily Henry-Aduamah [hereinafter "Shevily"], another GCT Inspection Assistant Manager.

6.      In turn, plaintiff was supervised directly by defendant Jian Wang [hereinafter "Wang"] who reported to defendant Douglas Schroeder [hereinafter "Schroeder"].

7.      Miyer does not have an engineering degree while plaintiff has a Master's Degree in Structural Engineering, graduated *cum laude* from the New Jersey Institute of Technology, BSc in Civil Engineering and an EIT certificate, a PE license in New York state and is a certified code enforcement officer.

8.      Miyer told plaintiff that when he was hired, Wang promised him the position she received that he did not believe a woman should have received the job over him.

9.      In fact, in 2018,  Miyer had asked senior management, including Glen Hayden, vice president for engineering, for this position and was denied it.

10.     Miyer's antagonism toward plaintiff was manifold and notorious in the unit and known to each defendant. Indeed, shortly after MNR hired plaintiff, when GCT maintenance employees and consultants asked him who managed the GCT Group and the new contract, Miyer identified himself.

11.     At meetings with consultants and MNR support personnel, Miyer would claim to be the group manager, asserting that he was in charge of technical tasks and that plaintiff did the paperwork for the unit, like paying invoices to consultants.

12.     In 2019, Miyer expressed resentment when plaintiff was invited to meetings convened with senior management, including Department heads and the Vice President of MNR, Dave Melillo, and demanded to know why he had not been invited to that meeting.

13.     From the commencement of her employment, plaintiff's subordinates routinely questioned her authority to perform her job, would not take direction from her and sought to circumvent her.

14.    In December 2018, Shevily received a "trouble ticket," but rather than send it to plaintiff for attention, she forwarded it to Bonilla, three levels about plaintiff.

15.    Even after Wang directed unit members to forward the ticket to plaintiff for action, they did not do so and plaintiff overheard Shevily and Miyer discussing it.

16.    The following month, plaintiff requested Miyer to escort outside consultants to conduct an inspection of transformer houses.

17.    Plaintiff confirmed with Thomas Gorman that her unit was required to provide such escorts and had to show Miyer Gorman's response before he would accept her direction.

18.    Likewise, rather than request time off from plaintiff, in early 2019, Shevily repeatedly provided her supervisor little notice and simply announced that she intended to be out of work and use one or another form of time.

19.    In late February 2019, Miyer sought to arrange access to inspection areas, again directly circumventing plaintiff and assuming her job duties.

20.    On February 28, 2019, after explaining that Miyer was conducting himself in a manner disruptive to the proper functioning of the unit, plaintiff advised Wang that Miyer  "doesn't recognize me as his manager so I am asking for your help."

21.    During the first quarter 2019, plaintiff was supposed to perform Miyer performance evaluation and make any changes to his goals and objectives.

22.    Yet, despite being so advised, Miyer sent documents required for his evaluation directly to Wang, again circumventing plaintiff.

23.    Meanwhile, through 2019, Shevily continued to violate essential rules of attendance, both taking time off without notice and then submitting time sheets which did not reflect her actual time and attendance.

24.    After plaintiff called Shevily on the latter practice, she did not copy Kraemer with the time

sheet she submitted for the week ending August 6, 2019.

25.    At the same time, Miyer followed suit, failing to send his time sheet for review to his supervisor, as was required.

26.    On August 28, 2019, plaintiff met with defendant Wang and Miyer to discuss the latter's mid-year review.

27.    During the preceding nine months, Miyer had refused to perform several assignments plaintiff provided to him, called her a bitch and shouted at her when she asked him to resend progress charts to the Transportation Department because his prior submissions contained errors.

28.    During the August 28 meeting, defendant Wang refused to allow plaintiff to explain these concerns and, instead, directed her to give him a good performance review which Undercut her capacity to supervise this employee.

29.    Indeed, during this meeting, Wang told plaintiff that if she gave Miyer a bad review, he would give her one.

30.    In September 2019, Wang scheduled inspection of an overhead bridge identified as HA27.47.

31.    Plaintiff's team member, Shevily, was to escort bridge inspectors to perform the inspection, yet Wang did not include Kraemer among the 13 people he emailed announcing the activity.

32.    This caused plaintiff to respond to Wang, "I was wondering if I should be copied on this chain of emails, since Shevily will be working on this job for two nights. I will be signing her comp time. Perhaps as a courtesy you could copied me too. Is one of my responsibilities to know how Miyer and Shevily are accumulating comp time and what they are occupied with."

33.    This communication exemplified the more central issue: while plaintiff was assigned to manage both Miyer and Shevily, Wang communicated directly with them assign them work and by-pass plaintiff without even copying her.

34.    On several occasions, plaintiff asked Wang to include her so she would have some idea what

her subordinates had been assigned to do. Wang continued the practice.

35.   Based upon defendant Wang's practice, Shevily engaged in the same conduct, arranging activities without even advising her manager of what she was doing.

36.   This caused plaintiff to advise Shevily on October 1,2019, "Please copy me on emails relating to your work activities.  It is my job to know where you are and what you are occupied with during the eight hours you are on the MNR territories."

37.   On October 2, 2019, in response to plaintiff's direction, Shevily requested a meeting with Bonilla, Miyer and the plaintiff.

38.   At this meeting, Bonilla asked Miyer and Shevily to explain to her their concerns, but would not allow plaintiff to speak and cut her off when she tried.

39.   Following the meeting, Shevily mocked plaintiff asking, "How do you expect us to respect you as our manager, if you did not say a word. You are a weak leader."

40.   At this meeting, Bonilla instructed Miyer to stop calling defendant Wang and told plaintiff to give Miyer space.

41.   During the succeeding three months, Miyer would not speak with plaintiff and essentially ignored her.

42.   In early January 2020, despite this lack of contact, Miyer complained to Wang about the plaintiff, falsely claiming she was always criticizing him.

43.   In response, plaintiff advised Bonilla that she had not criticized Miyer, was focused on a myriad of important projects and sought her assistance at controlling Miyer.

44.   In early February 2020, plaintiff raised with Miyer his [and Shevily's] practice of representing [through emails] that they were "in the office" working when, in fact, they were not.

45.   Plaintiff wrote her subordinate, "Miyer, I suggest sending out the schedule from the office. Today, you are coming at 9-9:30, and Shevily comes about the same time.  You already sent out the

schedule that you are working at the office, but you are not here yet."

46.    Plaintiff viewed her subordinates' transmission of false emails as a fraudulent representation allowing the theft of time from their employer.

47.    Despite her express concern, both subordinates continued to so misrepresent their activities.

48.    Defendant Wang, plaintiff's supervisor, told her that she need not check her subordinates' time records, that this was someone else's job [though no one else would know of their time and attendance abuse].

49.    Later in October 2020, after COVID disrupted normal affairs, plaintiff advised her supervisors that Miyer was not following protocols which required absence from work after exposure to co-workers who tested positive for COVID.  Again, plaintiff's concern were ignored.

50.    In early 2021, plaintiff continued to advise Wang that her subordinates failed to advise her of their whereabouts and assignments.

51.    On February 12, 2021, plaintiff advised Douglas Schroeder, who had replaced Bonilla, of the ongoing issue: "Shevily doesn't notify me when she responds to bridge strikes.  She tells me afterwards when she needs me to sign her comp time. She does not follow the MTA policy and because of that, I am forced to brake the policy."

52.    When Shevily apologized to her supervisor for breaking policy and claimed it was an "oversight," plaintiff responded to Wang and Schroeder, "An OVERSIGHT is just ones, maybe twice. This has been going on for over two years now."

53.    Apart from her failure to report activities to plaintiff, Shevily missed GCT Structural Inspection Group meetings without explanation or notice.

54.    In April 2021, Miyer was notified of "falling concrete" at the 52 St. Emergency Exit but failed to advise plaintiff.

55.    Plaintiff advised defendants Schroeder and Wang of Miyer's behavior because it again

disallowed her to properly perform her functions, including prompt response to emergency conditions.

56.     In May 2021, plaintiff asked Miyer and Shevily to assist with certain inspections.

57.     Shevily agreed but Miyer told plaintiff to look for someone else because he was too busy on Wang's projects.

58.     In June 2021, defendant Schroeder convened a meeting with defendant Wang, Shevily, Miyer and the plaintiff.

59.     At the meeting, plaintiff explained that in light of their refusal to report to her and their repeated circumventions of her authority, she did not want to remain responsible for Shevily and Miyer.

60.     Plaintiff volunteered to take on additional projects in lieu of supervising these employees.

61.     On or about July 15, 2021, Schroeder advised plaintiff that, given her "heavy work load," Wang would directly supervise Miyer and Shevily.

62.     In early October 2021, plaintiff worked as project manager coordinating an emergency inspection and gave instructions to the consultant to bring the hi-rail equipment to a specific site and to assist the building structural engineer; Miyer canceled this instruction.

63.     Plaintiff reported the problem to defendant Wang who told her that Miyer was managing the Hi-Rail equipment and to let Miyer do what he wanted to do.

64.     As project manager, plaintiff was supposed to decide where to deploy the equipment and the inspection priorities.

65.     Again, her authority was entirely disrespected, now with defendant Schroeder's endorsement.

66.     On July 5, 2022, plaintiff filed an internal complaint alleging discrimination based upon age, gender and national origin; in her complaint, plaintiff focused on recent events orchestrated by Ayeisha Morrison.

67.     Defendant Gary Martens of HR was assigned to investigate this complaint.

68.     On July 11, 2022, plaintiff communicated with Martens concerning Miyer, explaining the

adverse impact of his behavior on her ability to perform her critical job functions and the lack of

support she had long received from supervisory personnel as she sought to have him both respect her

authority and be civil in the workplace.

69.     Concurrently, on July 12, 2022, plaintiff reported to defendant Bonilla that she was project

manager for the GCT Inspections and that Miyer was working on the project.

70.     Plaintiff explained that she was afraid to speak with Miyer "because he starts yelling, calling me

names and...attacks my physical appearance.  He is aggressive and won't step away from my desks.

During his outbursts of anger, I am afraid he will hit me."

71.     Plaintiff enumerated several examples of Miyer's insubordinate conduct and the adverse

effect he was having on unit performance, including his sabotage of plaintiff's responses to infra-

structure emergencies.

72.     Plaintiff requested Miyer's reassignment to another project defendant Wang was supervising

and reported that Wang had refused to support her and told her to "let Miyer be Miyer."

73.     The same day, plaintiff again emailed defendant Martens explaining the problems Miyer was

causing her and citing other harassment she had recently been subjected to by members of the

personnel office.

74.     On July 27, 2022, Martens advised plaintiff, "...based on the information you provided to me

your complaint now clearly includes allegations of disrespectful and unprofessional treatment and the

use of a derogatory term against another employee on the basis of gender, which is a protected class. As

such, you are encouraged to contact Deputy Director, Bernadette Nespole, in our office of Diversity

and EEO about this matter."

75.     On August 5, 2022, plaintiff reported to defendants Bonilla, Schroeder and Wang that others

were now ignoring her responsibilities and interacting Miyer as if he were in her position.

76.     She explained that on August 3, 2022, G. Monasterio, the Grand Central Terminal Master, convened a zoom meeting with GCT Maintenance, the Transportation Department and Maintenance of Way, excluding plaintiff and conveying to Miyer technical questions and concerns which related to Kraemer's responsibilities.

77.     She related that Miyer again failed to inform her of the meeting and acted as if he had assumed her authority.

78.     Plaintiff concluded her memo, "I cannot react timely to requests, if the information is withheld from me. Please talk to Miyer. Jian and I already have."

79.     On August 22, 2022, while her internal Title VII complaint was pending and after she revealed to defendant Martens the abusive conduct to which she had been subjected, Shevily and Miyer told plaintiff that she was going to get "slapped."

80.     The same day, defendant Martens met with plaintiff and claimed that she had provoked Miyer to behave as he did toward her.

81.     In response to plaintiff's plea for assistance, defendant Bonilla signed a memo dated August 22, 2022 which, while acknowledging plaintiff's satisfactory job performance, falsely claimed [as had prior performance evaluations] that she failed to promote respectful and professional interactions with her colleagues.

82.     Defendant Bonilla proposed bi-weekly meetings so she and Wang could provide feedback on plaintiff's interactions with employees and others.

83.     Defendant Bonilla's memorandum was issued in bad faith, at the behest of defendant Martens, to cover the disrespectful manner which Metro North employees, particularly his colleague Morrison, defendant Wang and Miyer, extended toward plaintiff during the prior three years.

84.     Plaintiff requested to meet with defendant Wang, her supervisor, to discuss the memo

defendant Bonilla signed.

85. Defendant Wang directed plaintiff to speak directly with defendant Bonilla.

86. Upon receipt of this memo, plaintiff immediately requested "the right to request to face my accusers."

87. When plaintiff spoke with defendant Bonilla, requesting a meeting, she directed her back to Wang.

88. Plaintiff again spoke with Wang, who told her that defendant Martens had written the August 22 memo for defendant Bonilla's signature.

89. Regardless of who wrote the false memo, no one would meet with plaintiff to explain or defend its content.

90. On October 10, 2022, plaintiff again requested to meet to discuss the August 22, 2022 memo, but, again Bonilla did not respond.

91. On October 26, 2022, Bonilla finally responded, not denying that Martens had prepared the August 22, 2022 memo which she signed, and asking plaintiff to refute the claims made against her.

92. Defendant Bonilla explained that defendant Martens found plaintiff's complaint against Ayeisha Morrison "groundless" and this "led to a more in-depth investigation" into plaintiff's conduct.

93. In fact, defendant Martens never suggested to plaintiff that he was investigating her conduct.

94. Instead, he encouraged her to file a second internal discrimination complaint and did not share with her any findings he made on her complaint against Ayeisha Morrison.

95. By letter dated October 27, 2022, Nespole advised plaintiff that her office had investigated plaintiff's complaints about Morrison and found "no reasonable cause" to believe that she engaged in conduct that violated relevant Metro-North policies.

96. The same letter ironically advised plaintiff that harassment or retaliation against her for filing

her complaint "will not be tolerated."

97.  In October 2022, defendants Schroeder and Wang took away plaintiff's executive desk and reassigned her to a cubicle one third the size of her prior office space.

98.  When plaintiff explained that this did not provide her with room to set out her project materials and maps, they mocked her.

99.  In December 2022, defendants Wang, Schroeder and Bonilla met with plaintiff and advised that the following month, she would resume her responsibilities as manager of the Grand Central Terminal Structural Inspection Group.

100.  Plaintiff raised concerns, explaining she could not manage Miyer; defendant Bonilla told her not to worry about him.

101.  On February 10, 2023, defendant Wang directed plaintiff to the conference room to discuss her performance with him and defendants Martens, Schroeder and Bonilla.

102.  At this meeting, defendant Wang handed plaintiff a pretextual performance improvement plan which charged that she did not effectively supervise her direct reports [the document referenced events more than 18 months old], failed to communicate effectively with colleagues [no examples were provided] and failed to take appropriate direction from her supervisors [this was after the August 22, 2022 memo which found no fault with her job performance and made no claim that she failed to take direction].

103.  The performance improvement plan chastised plaintiff for bringing her Title VII internal complaint, referencing her "unfounded accusations that your colleagues are treating you differently than others".

104.  It also baselessly asserts that she failed to properly manage direct reports through July 2021, refused to supervise an [unruly] subordinate [Miyer] who refused to take direction from her, causing the temporary reassignment of supervisory duties to defendant Wang.

105. Indeed, the performance improvement plan was a sham, concocted as a calculated and necessary prelude to plaintiff's termination.

106. At the performance improvement meeting in early March 2023, plaintiff stated that she was the project manager for the GCT Trainshed Overhead and Under-grade Bridge Inspection project but that Miyer had been permitted to interfere in those projects by canceling critical instructions she provided consultants regarding high priority tasks.

107. Martens instructed that plaintiff speak one on one with Miyer following the meeting.

108. In March 2023, plaintiff initiated a conversation with Miyer in which she raised his prior conduct; he denied it and blamed plaintiff.

109. Plaintiff's male supervisors, including Schroeder, supported Miyer's false narrative, effectively ganging up against plaintiff.

110. As Miyer's supervisor, through the late winter 2023, plaintiff observed that he continued to abuse the time and attendance system.

111. When she tried to stop Miyer from doing this and he refused. Plaintiff called the Office of Inspector General to report his theft of time.

112. Defendants  Bonilla, Martens, Schroeder and Wang again met with plaintiff on March 23, 2023.

113. By this date, they had learned that plaintiff reported Miyer to OIG and defendant Bonilla threatened plaintiff, telling her that this was not the MTA OIG's business.

114. At this meeting, defendant Bonilla claimed that plaintiff had "reached the very bottom and there was no room for her to fall any lower."

115. In fact, rather than apply MTA standards to employees, Bonilla sought to cover up time theft by both Miyer, Shevily and others, including Jiax Young who regularly swiped in/out from Grand Central though his office was in North White Plains.

116. On June 8, 2023, Metro North terminated plaintiff from her "management position of Senior Engineer, GCT Structures" effective that day.

117. Despite best efforts, to date, plaintiff has not found comparable employment.

118. During her search for other work, plaintiff has learned that defendants have defamed her professional standing, making it next to impossible for her to find a comparable position.

119. Defendants Bonilla, Schroeder, Wang and Martens collectively violated plaintiffs' rights by embracing the sexist attitudes of her subordinate Miyer and allowing his hostility to dominate and influence their decisions regarding plaintiff's continued employment.

120. Defendants Bonilla, Schroeder, Wang and Martens failed to provide plaintiff managerial support on the basis of her gender, allowing the sexist attitudes of Miyer to dominate and influence their decisions regarding plaintiff's duties and responsibilities and refusing to support plaintiff's reasoned and reasonable expectations and demands of her subordinates.

121. Defendants together fabricated a narrative regarding plaintiff's incapacity to get along with others when, in fact, one of the principal examples arose when plaintiff followed Wang's direction as to how to gain sign off for an important agreement with a vendor.

122. Defendant Wang never admitted that plaintiff was merely following his direction when she wrote language which offended the legal department and allowed plaintiff to be wholly blamed for this incident.

123. Defendants each knew that Miyer harbored sexist views toward and against plaintiff and would not follow her directions or lead and resented her exercise of supervisory responsibility over him.

124. Rather than reassign Miyer or appropriately discipline him, the defendants coddled him and colluded to terminate plaintiff.

125. Plaintiff has suffered substantial financial and non-financial damages as a consequence of this course of conduct.

126. Defendants collectively decided to terminate plaintiff's employment and MNR, their employer, delegated that authority to them.

### AS AND FOR HER CAUSES OF ACTION

127. Plaintiff incorporates paras. 1-126 as if fully re-written herein.

128. By intentionally terminating plaintiff's employment on account of her gender, defendants eacn and  collectively violated the Equal Protection clause of the Fourteenth Amendment as made actionable against them as state actors by 42 U.S.C. Section 1983.

129. By intentionally terminating plaintiff in retaliation for her good faith complaint of gender discrimination, defendants each and collectively violated the Equal Protection clause of the Fourteenth Amendment as made actionable against them as state actors by 42 U.S.C. Section 1983.

130. By intentionally subjecting plaintiff to inferior terms and conditions of employment based upon her gender, each defendant violated the equal protection clause of the Fourteenth Amendment as made actionable against them by 42 U.S.C. section 1983.

131. By intentionally terminating her on the basis of her gender, defendants each and collectively violated section 296 of the Executive Law of the State of New York and the New York City Human Rights Law.

132. By intentionally terminating her in retaliation for her good faith complaint of gender discrimination, each defendant violated section 296 of the Executive Law of the State of New York and the New York City Human Rights Law.

133. By intentionally subjecting plaintiff to inferior terms and conditions of employment based upon her gender, defendants each and collectively violated section 296 of the Executive Law of the State of New York and the New York City Human Rights law.

-14-

**PRAYER FOR RELIEF**

     **WHEREFORE**, plaintiff prays that this Honorable Court accept jurisdiction over this matter, empanel a jury to hear her claims, award to her and against defendants jointly and severally compensatory damages with pre and post-judgment interest, award punitive damages against each defendant for their wanton and malicious violation of her constitutional and statutory rights, award to her the reasonably incurred attorneys' fees and costs arising from her prosecution of this matter and enter any other order required by law and/or equity.

Dated: 12 February 2024

                    Respectfully submitted,

                    Michael H. Sussman [3497]

SUSSMAN & GOLDMAN
1 RAILROAD AVENUE, STE. 3
GOSHEN, NY 10924
(845)-294-3991
sussman1@sussman.law

Counsel for Plaintiff

-15-